# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

| | |
|---|---|
| **SUNBELT RENTALS, INC.,** | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :   **CIVIL ACTION NO.:** |
| | : |
| **JASON MONAHAN** | : |
| | : |
| Defendant. | : |

## COMPLAINT FOR INJUNCTIVE RELIEF
## AND DEMAND FOR JURY TRIAL

Plaintiff, Sunbelt Rentals, Inc. (hereinafter "Sunbelt" or "Plaintiff") hereby submits the following Complaint for Injunctive Relief (hereinafter "the Complaint") against Defendant Jason Monahan ("Defendant"). Defendant was a former national director-level employee for Sunbelt with intimate knowledge of Sunbelt's business strategies, confidential information, and trade secrets. This lawsuit arises from Defendant's breach of his Employment Agreement with Sunbelt (hereinafter the "Employment Agreement" or "Agreement") by joining Sunbelt's direct competitor, Axis Portable Air, LLC ("Axis"), in a competitive role in the rental climate control industry, shortly after his resignation from Sunbelt.[1] Because Axis competes directly with Sunbelt in the climate control industry, in multiple geographic areas where Defendant had high-level job responsibilities with Sunbelt, Defendant's employment with Axis violates the terms of the Agreement and threatens the inevitable disclosure and misappropriation of Sunbelt's confidential,

---

[1] As discussed in greater detail below, Defendant initially stated that he had accepted the role of Chief Financial Officer of Axis along with an equity stake in the company. During pre-suit communications, Defendant's counsel indicated that Defendant's role has since been changed to Branch Manager of Axis's Tucson, Arizona location with no equity stake in the company during the term of the Agreement at issue. However, Defendant has provided no proof to substantiate his counsel's informal representation.

proprietary, and trade secret information. Accordingly, Sunbelt seeks temporary and permanent injunctive relief and other relief under Florida Statutes § 542.335 and Florida Statutes § 688.003, as well as under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq. ("DTSA"), and Florida common law.

## NATURE OF THE ACTION AND RELIEF REQUESTED

1.     Sunbelt brings this action to enforce the restrictive covenants contained in the Agreement Defendant signed when hired by Sunbelt.   These covenants temporarily preclude Defendant from owning any interest in, or becoming employed by, any corporation that competes with Sunbelt within the applicable restricted territory, and prohibit him from using or disclosing Sunbelt's confidential, proprietary, and trade secret information.

2.     Sunbelt seeks temporary and permanent injunctive relief to compel Defendant to comply with his obligations, statutory and otherwise, and to prevent the threatened and/or inevitable disclosure and misappropriation of Sunbelt's trade secrets and proprietary information that will occur if Defendant is permitted to own an interest in or perform high-level job duties for Axis, Sunbelt's direct competitor in the temporary climate control industry.

3.     As set forth below, Sunbelt asserts the following causes of action against Defendant: (1) breach of contract; (2) misappropriation of trade secrets under the Florida Uniform Trade Secrets Act; and (3) misappropriation of trade secrets under the federal Defend Trade Secrets Act.

## THE PARTIES

4.     Sunbelt Rentals, Inc. is a North Carolina corporation with its principal place of business located at 2341 Deerfield Drive, Fort Mill, South Carolina 29715.

5.     Upon information and belief, Defendant is a citizen and domiciliary of the State of South Carolina.

6.     Defendant was employed by Sunbelt from March 28, 2017 until August 7, 2020.

## JURISDICTION AND VENUE

7.     This Honorable Court may properly exercise personal jurisdiction over Defendant because he agreed to submit to personal jurisdiction of the state or federal courts in Florida in his Agreement with Sunbelt.  See Exhibit "A" at page 7, ¶ 12.

8.     Venue is proper in the United States District Court for the Middle District of Florida because Defendant agreed to a forum selection clause in his Agreement stating that  "[a]ny suit or other proceeding arising out of or relating to this Agreement shall be instituted and maintained in the state or federal courts sitting in Collier County, Florida, absent written consent of the Corporation to the contrary."  See Exhibit "A" at page 7, ¶ 12.

9.     The Agreement further states that Defendant "expressly waives any objections to such jurisdiction and venue and irrevocably consents and submits to the personal and subject matter jurisdiction of such courts in any such action or proceeding."  Id.

10.     The Middle District of Florida – Fort Myers Division is the appropriate venue for this matter because the breach of contract claim against Defendant (Count One) arises directly out of Defendant's Agreement, and because the Middle District of Florida encompasses Collier County, FL.

11.     Furthermore, the statutory claims against Defendant (Counts Two and Three) relate to Defendant's Agreement, which includes language designed to protect Sunbelt's trade secrets.

12.     This Court has federal question subject matter jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 in that the Complaint alleges a cause of action under federal law; namely, the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 et seq.

13.     This Court has supplemental jurisdiction over Sunbelt's state law claims pleaded herein because those claims share a common nucleus of operative fact and call for determination

3

of the same or substantially related or similar questions of law and fact. See 28 U.S.C. §§ 1367(a), 1441(c).

## FACTS

### Defendant's Employment with Sunbelt

14.     Sunbelt rents and sells, among other things, general industrial tools and equipment. See www.sunbeltrentals.com.

15.     In addition to tool and equipment rental, Sunbelt has several specialty businesses, including Climate Control, Power & HVAC, Flooring Solutions, and Industrial Services.  See www.sunbeltrentals.com/solutions/.

16.      One of Sunbelt's most valuable and growing specialty businesses is Climate Control & HVAC Equipment Rentals ("Climate Control"), which involves the rental of climate control devices such as temporary, portable, supplemental, large scale, and emergency cooling, heating, dehumidification, and air quality equipment.   See www.sunbeltrentals.com/ services/climate-control/.

17.     Sunbelt is a national market leader in the specialty Climate Control and HVAC solutions business.

18.     Sunbelt provides Climate Control and HVAC equipment services through a network of locations throughout the United States.  These locations (also referred to as "Profit Centers" abbreviated as "PCs") can be found by searching Sunbelt's website at www.sunbeltrentals.com/locations/.

19.     Sunbelt currently has over eighty (80) Climate Control PCs in the United States and Canada.

20.     Over the past three years, Sunbelt has acquired or opened over twenty (20) Climate Control PCs.

21.     Sunbelt has spent years and has invested and will continue to invest considerable resources to develop its business information, methods, and techniques; to identify and maintain relationships with customers; to learn customers' service needs; and to develop innovative solutions and business strategies to meet customers' service needs.  As part of his employment, and in consideration of the execution of the Agreement, Sunbelt provided Defendant with access to this information.

### Defendant's Role and Access to Confidential Information and Trade Secrets

22.     Defendant was employed by Sunbelt as its Director of Business Development for Sunbelt's Specialty Division, which includes its Climate Control business described above. Defendant's position was national in scope.

23.     Defendant worked out of Sunbelt's corporate headquarters in Fort Mill, South Carolina, which is referred to as the "support office" because it supports all of Sunbelt's PCs.

24.     At or around the time of his hire, on March 29, 2017, Defendant signed an Employment Agreement with Sunbelt, which contained within it, among other things, non-competition and confidentiality provisions. See Exhibit "A."

25.     In his role as Director of Business Development, Defendant oversaw critical aspects of Sunbelt's business development and strategic growth, with an emphasis on the growth of Sunbelt's specialty businesses across the United States, including strategy for opening new locations ("greenfield" strategy), acquisitions strategy, growth, sales, business planning and modeling.

26.     Defendant's duties brought him into frequent connection with Sunbelt's specialty PCs across the United States, including new and existing Climate Control PCs.

27.     As part of his job, Defendant routinely presented, reviewed, and analyzed financial metrics associated with Sunbelt's Climate Control PCs.

4842-8544-7628.v1

28.     Defendant was intimately involved in the acquisition evaluation, due diligence, integration, board approval, and post-closing performance of Sunbelt's newly acquired Climate Control PCs, as well as Sunbelt's "greenfields" strategy in new markets.

29.     Defendant was also involved in product analysis and sales strategies for existing Climate Control PCs.  During the last year of his employment, Defendant routinely attended meetings, summits, webinars, presentations, and retreats regarding the following topics:  business planning, sales strategy, product pipeline, new product development, market studies, and acquisitions.

30.     These meetings were attended by other high-level national Sunbelt executives and managers for several business lines, including Climate Control/HVAC.  Examples of high-level meetings Defendant attended between November 12, 2019 and July 31, 2020, printed from Defendant's calendar with Sunbelt (with confidential information redacted) are attached as Exhibit "B."

31.     Defendant also co-led Sunbelt's COVID-19 task force.  The task force's objectives included expanding Sunbelt's climate control and indoor air quality products (the same products that Axis rents) specific to COVID-19 related market demand.  See Exhibit "B" at page 14.

32.     The task force supported all Sunbelt PCs, and included product growth strategy for products such as air scrubbers – a product that both Axis and Sunbelt provide to customers.  See www.axisair.com/product-category/drying-equipment/air-scrubbers/ and www.sunbeltrentals. com/services/climate-control/.

33.     For example, Defendant prepared a 16-page document titled "New COVID Product Development Evaluation & Strategy" which included a detailed analysis of product details & metrics for Indoor Air Quality (IAQ) equipment, and an analysis of recent performance of certain

4842-8544-7628.v1

HVAC products during May, June and July of 2020. Relevant excerpts from this document (with confidential information redacted) are attached as Exhibit "C."

34.     By virtue of his position with Sunbelt, Defendant was exposed to and had a strong working knowledge of Sunbelt's unique methods of market analysis, product analysis, and strategic/financial planning with respect to opening/acquiring Climate Control PCs and achieving and maintaining the profitability of Sunbelt's Climate Control PCs.

35.     Furthermore, Defendant's job included working with Sunbelt's business unit leaders to devise growth and expansion strategies in order to grow existing Climate Control PCs. In this role, Defendant was involved with sales, operations, and Sunbelt's unique "go to market" strategies with new and existing Climate Control PCs across the United States.

36.     As such, Defendant is well aware of Sunbelt's confidential and unique strategies and knowledge with respect to growing and maintaining its Climate Control business through its network of PCs across the United States.

37.     Defendant's role with Sunbelt and review of Sunbelt's confidential information and trade secrets described above was not limited to prospective acquisitions and greenfields. Defendant routinely reviewed confidential financial data associated with **existing** Climate Control PCs, including analysis of the financial performance of those PCs. In short, Defendant was responsible for reviewing confidential information that constitutes Sunbelt's unique business model for the strategic growth of its Climate Control business.

38.     For example, on June 24, 2020, Defendant drafted and gave a presentation on the financial performance of Sunbelt's specialty divisions, including Climate Control. See Exhibit "B" at pages 21-22.

39.     That presentation included a breakdown of the financial performance of Sunbelt's Climate Control PCs that were either opened (greenfields) or acquired in 2018, 2019 or 2020,

including PCs in California, Colorado, Washington, and Utah.   Relevant excerpts from this presentation (with confidential information redacted) are attached as Exhibit "D."

40.     Defendant was primarily responsible for coordinating this financial presentation, but other high-level Sunbelt executives attended and participated as well.

41.     During that presentation, Sunbelt's Vice President of Climate Control, John Murray, presented on Sunbelt's "greenfield playbook" for further expansion in the climate control business.  Defendant was present for this portion of the presentation, which included details about Sunbelt's confidential strategies and trade secrets.

42.     Defendant also had access to a spreadsheet showing information about all of Sunbelt's acquisitions and greenfields from 2012 through 2020, including all climate control acquisitions and greenfields during that time – all of which became Sunbelt PCs when they were opened or acquired.   A copy of this spreadsheet (with confidential information redacted) is attached as Exhibit "E."

43.     Defendant also had access to a more detailed spreadsheet showing the following information for all Sunbelt acquisitions and greenfields since 2012: PC number, PC name, date opened, type, original equipment cost (OEC), trailing twelve months (TTM) rental revenue, TTM total rental, TTM total revenue, TTM profit center contribution, return on investment (ROI), and various calculations regarding goodwill (GW) associated with acquisitions.  The portion of this spreadsheet showing all Sunbelt US PCs acquired since 2012 (with confidential financial information redacted) is attached as Exhibit "F."  The portion of this spreadsheet showing all of Sunbelt's Climate Control greenfields opened since 2012 (with confidential financial information redacted) is attached herein as Exhibit "G."

44.     Sunbelt's business development team e-mailed Defendant an updated version of this detailed financial spreadsheet on a monthly basis.

4842-8544-7628.v1

45.     Defendant was responsible for routinely reviewing the data contained in the detailed spreadsheet and using it to analyze Sunbelt's financial performance and strategic growth, including for its Climate Control business.  Defendant would then utilize this analysis to evaluate growth opportunities for Sunbelt's Climate Control business.

46.     Among other things, the information in this spreadsheet would allow Defendant to evaluate what a successful Climate Control store or Profit Center should look like as it scales up during its first several years of operation.  This information would allow Defendant to specifically evaluate Sunbelt's initial investment in each location (OEC), as well as revenue and return on investment (ROI) connected to that that location within a certain period of time after acquisition or startup.  This type of information is extremely valuable to Sunbelt's development of new business, and is not publicly available.

47.     During the last 12 months of his employment with Sunbelt, Defendant was extensively involved with the potential acquisition of a regional climate control rental provider that provides temporary heating, cooling and drying products in the Midwest, Pacific Northwest, and Southwest, including the following states where Axis operates or is expanding to: Washington, Utah, Colorado and Arizona.

48.     This company (referred to herein as the "Target Company" to preserve confidentiality) has regional offices in Denver, Colorado and Auburn, Washington.

49.     Defendant attended high-level meetings regarding the planned acquisition of the Target Company in February and March of 2020.  See Exhibit "B" at pages 7, 9 and 10.

50.     Through his work with Sunbelt on the potential acquisition of the Target Company, Defendant gained extensive working knowledge of Sunbelt's confidential information and trade secrets, including Sunbelt's market data and financial information for these specific regions that would not have been available to him absent his employment as a high-level Sunbelt employee.

9

51.     During the course of evaluating this potential acquisition, Defendant prepared a market analysis of the areas where the Target Company operated, including the Seattle, Washington and Denver, Colorado areas.  That analysis included a review of Sunbelt's existing PCs in those regions.  Portions of Defendant's market analysis pertaining to these areas (with confidential information redacted) are attached as Exhibit "H" (Seattle) and Exhibit "I" (Denver).

52.     Sunbelt's confidential and proprietary pricing and service platforms, along with its client information, marketing strategies, pricing strategies, and other confidential information that Defendant reviewed and applied, has helped Sunbelt distinguish itself from its competitors and excel in the climate control rentals market.

53.     The above-referenced exhibits are non-exclusive examples of the vast quantity of Sunbelt confidential information and trade secrets that Defendant reviewed and utilized for his high-level role at Sunbelt.

54.     The collective information possessed by Defendant regarding Sunbelt's confidential methodology with respect to analyzing the financial viability of new and existing specialty profit centers in the climate control services industry, strategies with respect to expanding existing specialty profit centers (including expanding product lines, etc.), and sales, operations, and marketing strategies with respect to integrating new acquisitions/locations, is unique to Sunbelt and is not generally known or readily available to the public.

55.     Sunbelt took steps to keep this information confidential including, but not limited to, requiring employees such as Defendant to sign employment agreements containing nondisclosure and noncompetition provisions such as the Agreement at issue.

56.     If such information was disclosed or otherwise made available to its competitors such as Axis, those competitors would be able to unfairly compete with Sunbelt.

4842-8544-7628.v1

57.     Defendant has gained critical and unique marketing, financial, and business development knowledge by working with Sunbelt, including the precise financial metrics, staffing levels, real estate, startup capital, and inventory necessary to establish a new Climate Control PC or to improve the performance of existing Climate Control PCs.

### The Employment Agreement

58.     On March 27, 2017, Defendant entered into an Employment Agreement with Sunbelt. See Exhibit "A."

59.     Pursuant to the Agreement, Defendant agreed that:

"as a result of [his] employment by the Corporation, [he] will have access to valuable, highly confidential, privileged, and proprietary information relating to Corporation's Business…."

Id. at ¶ 5 (Page 3).

60.     Defendant also committed to certain present and future obligations during, and subsequent to the termination of, his employment with Sunbelt, including noncompetition obligations as well as obligations with respect to the nondisclosure of Sunbelt's confidential information, intellectual property, and proprietary materials.  Id.

61.     In particular, Defendant agreed to not:

"**provide information to**, solicit or sell for, **organize or own any interest in** (either directly or through any parent, affiliate, or subsidiary corporation, partnership, or other entity), **or become employed or engaged by, or act as agent for** any person, corporation, or other entity that is directly or indirectly engaged in a business in the 'Territory,' as hereinafter defined, which is substantially similar to the Business as conducted at the Designated Stores or **competitive with Corporation's Business** as conducted at the Designated Stores . . . ."

Id. at ¶ 5.2.5 (Page 5) (emphasis added).

62.     Within the Agreement, the covered "Territory" is defined as:

"the geographical area within a fifty (50) mile radius of any of the Corporation's stores in which, **or in connection with which**, [Defendant] performed **or was responsible for performing services** at any time during the twelve (12) month period immediately

preceding the termination or expiration of this Agreement for any reason (the 'Designated Stores)."

Id. at ¶ 5.2 (Page 5) (emphasis added).

63.     Paragraph 5.2.5 of the Agreement includes a limited exception, which states that "nothing herein shall preclude the Employee from (i) engaging in activities or being employed in a capacity that do not actually compete with Corporation's Business…." This exception is not limited by geography; rather, it refers to the defined term "Business." Id. at ¶ 5.2.5 (Page 5)

64.     In the section of the Agreement that defines the terms "Business," Defendant acknowledged and agreed that Sunbelt was engaged in the relevant business of selling and renting climate control units, among other things. The definition of "Business" is not limited by geographic area. Id. at ¶ 5 (Page 3).

65.     As detailed above, Defendant provided business development services in connection with Sunbelt's existing and new Climate Control PCs in the United States.

66.     Defendant agreed that the restrictive covenants in the Agreement were "fair and reasonable and reasonably required for [Sunbelt's] protection of its legitimate business interests, including, without limitation, the confidential and proprietary information and trade secrets of the Corporation, the substantial relationships between the Corporation and its customers, officers, directors, employees, independent contractors, agents and other personnel, and the goodwill of the Corporation." See Exhibit "A" at ¶ 10 (Page 7).

67.     The Agreement further provides that, during the term of the Agreement and after its termination or expiration for any reason, Defendant will not "use, divulge, disclose, furnish, or make accessible to any third person, company, or other entity any aspect of [Sunbelt's] Confidential Information, Intellectual Property, or Proprietary Materials…." Id. at ¶ 5.1 (Page 4). These terms are defined as follows:

a.    "Confidential Information" is defined as, but is not merely limited to: existing and future equipment information, customer lists, identities of distributors and distributorships, sales methods and techniques, costs and costing methods, pricing techniques and strategies, sales agreements with customers, profits and product line profitability information, unpublished present and future marketing strategies and promotional programs, and other information regarded by Corporation as proprietary and confidential. Id. at ¶ 5 (Page 3).

b.    "Intellectual Property" is defined to include, among other things, computer programming code, designs, technology, techniques, processes, ideas, concepts, discoveries, algorithms, models, improvements, modifications, know-how, methods, developments, proprietary information, data, work product, works of authorship, and inventions (whether or not patentable), patents, copyrights, trademarks, service marks, trade secrets, and trade dress relating to Sunbelt's business that were received, created, developed, conceived, or otherwise acquired or made by Defendant in connection with his employment with Sunbelt.. Id. at ¶ 6.1 (Page 6).

c.    "Proprietary Materials" is defined to include, among other things, Sunbelt's "documents, materials, records, media, and other tangible property (confidential or non-confidential) relating to its business that were received, created, development, conceived, or otherwise acquired or made by Defendant in connection with his employment with Sunbelt. Id. at ¶ 6.2 (Page 6).

68.    The Agreement further states that Defendant's breach or threatened breach of Paragraphs 5 through 6 of the Agreement would entitle Sunbelt to an injunction to prevent the breach or threatened breach of Defendant's contractual obligations. Id. at ¶ 5.3.1 (Page 5).

69.    Defendant also agreed that the "Restrictive Period" to which he would be bound would "not include any period of time in which [he] is in violation of the Restrictive Covenants." Id. at ¶ 5.3.3 (Page 5).

**Defendant Resigns from Sunbelt and is
Hired by Axis, a Direct Competitor**

70.    On August 3, 2020, Defendant informed Sunbelt's Senior Vice President, Business Development, Sales and Marketing for Specialty, Kyle Horgan, that he was resigning in order to work for a direct competitor, Axis Portable Air, as its CFO, with an equity stake in the business.

71.    Mr. Horgan informed Defendant that he could work on a few remaining items from him until complete, and then Defendant and Sunbelt would part ways.

13

72.     Defendant's last day with Sunbelt was August 5, 2020.

73.     Defendant's separation from Sunbelt was processed effective August 7, 2020.

74.     Shortly after Defendant announced his resignation and decampment to a direct competitor, Mr. Horgan and Kurt Kenkel, Sunbelt's Executive Vice President for Administration and Business Development, had a discussion with Axis's principal, David Walling, in which Mr. Walling confirmed his intention to hire Defendant.

75.     Axis is a startup company that has been in operation for approximately one year. Axis is owned by Mr. Walling. Mr. Walling formerly owned a company called Apex Pump, which Sunbelt acquired in November of 2018. Mr. Walling is a former Sunbelt employee.

76.     Like   Sunbelt,   Axis   rents   and   sells   climate   control   units.   <u>See</u> <u>https://www.axisair.com/the-solutions/</u>.

77.     Axis and Sunbelt are direct competitors in the Climate Control business – the same business that Defendant was responsible for developing during his employment with Sunbelt.

78.     Defendant leaned about Mr. Walling when Sunbelt acquired Mr. Walling's prior company, Apex pump.  Defendant and Mr. Walling met through that transaction.

79.     Mr. Walling gained general knowledge of Sunbelt's Climate Control business through his introduction to and work with Sunbelt.

80.     Mr. Walling was also aware that Defendant had extensive involvement with and responsibility for the growth and development of Sunbelt's Climate Control business during that time.

81.     After an exchange of pre-suit correspondence, Defendant's counsel represented that Defendant's responsibilities for Axis have shifted, and that he will be employed for the duration of the Agreement as a Branch Manager, without an equity stake in Axis, for one of Axis's location that provides climate control equipment sales and rentals in Tucson, Arizona.  As of the filing of

14

this Complaint, Plaintiff has received no proof confirming this informal representation from counsel.

**Axis Competes With Sunbelt Within Defendant's Restricted Territory**

82.     Axis currently has four locations:

(a)     4132 W. Venus Way, Chandler, AZ 85226 (headquarters);

(b)     2450 W. Ruthrauff Rd., #180, Tucson, AZ 85705 (branch location);

(c)     4800 W. University Ave., Las Vegas, NV 89103 (branch location); and

(d)     3820 Oceanic Drive, Ste. 313, Oceanside, CA 92056 (branch location).

See Exhibit "J"; www.axisair.com/contact

83.     Axis's Chandler, AZ headquarters is approximately thirteen (13) miles from Sunbelt PC 737, located at 3832 E. Roeser Road, Phoenix, AZ 85040.

84.     Sunbelt rents and sells temporary, portable, supplemental and emergency cooling, heating and dehumidification equipment out of PC737. See https://www.sunbeltrentals.com/locations/737/.

85.     Axis's Las Vegas, NV location is approximately 3.5 miles from Sunbelt PC 738, located at 4347 West Sunset Road, Las Vegas, NV 89118.

86.     Sunbelt rents and sells temporary, portable, supplemental and emergency cooling, heating and dehumidification equipment out of PC 738. See https://www.sunbeltrentals.com/locations/738/.

87.     Axis's Oceanside, CA location is approximately 16 miles from Sunbelt PC 473, located at 245 Pauma Place, Escondido, CA 92029.

88.     Sunbelt rents and sells temporary, portable, supplemental and emergency cooling, heating and dehumidification equipment out of PC 473. See https://www.sunbeltrentals.com/locations/473/.

15

89.     Defendant was responsible for performing business development services  in connection with Sunbelt's Climate Control PCs, including but not limited to PC numbers 737 (Phoenix, AZ); 738 (Las Vegas, NV); and 473 (Escondido, CA).

90.     For example, Climate Control PCs 737 and 738, both of which were acquired by Sunbelt in October of 2014, appear on the detailed financial spreadsheets that Defendant received routinely in the course of his employment and was responsible for reviewing.  See Exhibit "F" at page 2.

91.     Therefore, the following locations in which Axis currently operates are part of Defendant's restricted "Territory" under Paragraph 5 of the Agreement: Chandler, AZ (Axis headquarters), Las Vegas, NV (Axis branch), and Oceanside, CA (Axis branch).  See Exhibit "A" at page 5.

92.     Through these existing locations, Axis is currently directly engaged in a competitive business within the "Territory."

93.     As the CFO of Axis with an ownership interest, Defendant will be or already is engaged in competitive activities in connection with Axis's Chandler, AZ headquarters, as well as its existing Las Vegas and Oceanside branches, all of which are within the "Territory."

94.     As the Branch Manager of Axis's Tucson, AZ location, Defendant will be or already is employed by an entity currently directly engaged in a competitive business within the "Territory," and will be or already is engaging in activities that actually or potentially compete with Sunbelt's Climate Control business.

**Axis is Actively Expanding Within Defendant's Restricted Territory**

95.     Axis is currently advertising for job openings in the following locations:

    a.   Phoenix, AZ (service technician);

    b.   Tucson, AZ (outside sales representative, service technician);

16

    c.  Las Vegas, NV (outside sales representative, service technician);

    d.  Los Angeles, CA (outsides sales representative, service technician);

    e.  San Diego, CA (outside sales representative, service technician);

    f.  Denver, CO (outside sales representative, service technician);

    g.  Salt Lake City, UT (outsides sales representative, service technician);

    h.  Seattle, WA (outside sales representative, service technician).

See Exhibit "K"; www.axisair.com/careers

96.    By letter dated August 25, 2020, Axis's counsel acknowledged that Axis's owner, Mr. Walling, has already identified potential new Axis locations in Salt Lake City, UT and Denver, CO.  However, Axis's counsel incorrectly asserted that Sunbelt did not have any "Designated Stores" (as that term is defined in the Agreement) within fifty miles of those two cities.  See Exhibit "O."

97.    In fact, Sunbelt has multiple Climate Control PCs within fifty miles of seven of the eight locations listed above.  Per the Agreement, Defendant was responsible for performing work "in connection with" these Climate Control PCs.

98.    As noted above, Defendant was responsible for performing business development services for Sunbelt in connection with Climate Control PC 737 in Phoenix, AZ, and Climate Control PC 738 in Las Vegas, NV.

99.    Sunbelt has a Climate Control PC (PC 733) in Carson, CA, approximately nineteen miles from Los Angeles, CA.  Sunbelt rents and sells temporary, portable, supplemental and emergency cooling, heating and dehumidification equipment out of PC 733.  See https://www.sunbeltrentals.com/locations/733/

100.    Sunbelt PC 473 (Escondido) is approximately 30 miles from San Diego, CA.

4842-8544-7628.v1

101. Sunbelt has a Climate Control PC (PC 746) located in Denver, CO.  Sunbelt rents and sells temporary, portable, supplemental and emergency cooling, heating and dehumidification equipment out of PC 746. See https://www.sunbeltrentals.com/locations/746/

102. PC 746, which Sunbelt acquired in October of 2014, appears on the financial spreadsheets that Defendant routinely received in the course of his employment, and was responsible for reviewing and analyzing.  See Exhibit "F" at page 2.

103. Sunbelt also has a Climate Control PC (PC 1168) located at 3697 S Naches Ct., Englewood, CO, approximately nine miles from Denver, CO.   Sunbelt rents and sells temporary, portable, supplemental and emergency cooling, heating and dehumidification equipment out of PC 1168. See https://www.sunbeltrentals.com/locations/1168/

104. Sunbelt acquired PC 1168 on or about February 2019, as part of its acquisition of Temp-Air, a climate control rental provider that operated in thirteen markets, including Denver, CO and Salt Lake City, UT.

105. Defendant prepared the historical and pro-forma financial analysis, as well as the Board of Directors approval document, for the Temp-Air acquisition, including analysis of company financials, personnel, overall Climate Control market opportunity, competitive landscape, fleet analysis, real property and facilities, customer base, operational plan, risks & opportunities, due diligence and timetable.

106. After the Temp-Air acquisition was completed, the Temp-Air locations became Sunbelt PCs.  These new locations include PC 1168 (Englewood, CO) and PC 1169 (Pleasant Grove, UT).

107. After the Temp-Air acquisition was completed, and up until his resignation from Sunbelt in August of 2020, Defendant continued to be responsible for performing business development services in connection with the PCs acquired from Temp-Air, including PCs 1168

18

and 1169.  Those services included review and analysis of the financial data for those PCs.  Both PCs 1168 and 1169 appeared on the financial spreadsheets that Defendant was responsible for reviewing, as well as the June 2020 specialty financial review presentation that Defendant prepared and led.  See Exhibits "D" and "F."

108.    The Target Company, which Defendant was involved in potentially acquiring on behalf of Sunbelt during the last twelve months of his employment, also has a location in Denver, CO, and Defendant became familiar with that market during his employment with Sunbelt.

109.    For example, Defendant worked on a document analyzing the Target Company's capabilities in Denver, which specifically referenced existing Sunbelt PCs 746 (Denver) and 1168 (Englewood), including square footage and lease information.  See Exhibit "I."

110.    Thus, Defendant performed services "in connection with" PCs 746 and 1168.

111.    Sunbelt has a Climate Control PC (PC 567) located in Salt Lake City, UT.  Sunbelt rents and sells temporary, portable, supplemental and emergency cooling, heating and dehumidification equipment out of PC 567. See https://www.sunbeltrentals.com/locations/567/

112.    Sunbelt also has a Climate Control PC (PC 1169) located at 639 W. State Rd., Pleasant Grove, UT, approximately thirty-five miles from Salt Lake City, UT. Sunbelt rents and sells temporary, portable, supplemental and emergency cooling, heating and dehumidification equipment out of PC 1169. See https://www.sunbeltrentals.com/locations/1169/

113.     Sunbelt acquired PC 1169 on or about February 2019, as part of the Temp-Air acquisition described above.

114.    During the last twelve months of his employment, Defendant was responsible for providing business development services in connection with PC 1169, including strategic and financial analysis of this location's performance.  See Exhibit "D" at page 15; Exhibit "F" at page 6.

19

115.    Thus, Defendant performed services "in connection with" PC 1169.

116.    Sunbelt has a Climate Control PC (PC 736) located at 1307 W. Valley Hwy. N. Ste. 104, Auburn, WA, approximately twenty-five miles from Seattle, WA.  Sunbelt rents and sells temporary, portable, supplemental and emergency cooling, heating and dehumidification equipment out of PC 736. See https://www.sunbeltrentals.com/locations/736/.

117.    PC 736, which Sunbelt acquired in October of 2014, appears on the financial spreadsheets that Defendant received each month and was responsible for reviewing and analyzing.  See Exhibit "F" at page 2.

118.    The Target Company also has a location in Auburn, WA, and Defendant became familiar with that market during his last twelve months of employment with Sunbelt.

119.    Defendant worked on a document analyzing the Target Company's capabilities in Auburn which specifically referenced existing Sunbelt PCs 1166 (Longview, WA) and 736 (Auburn, WA), including square footage and lease information.  See Exhibit "H."

120.    In his role as Director of Business Development for Specialty with Sunbelt, Defendant was responsible for performing business development services in connection with Sunbelt's Climate Control PCs, including but not limited to PC 733 (Carson, CA); PC 746 (Denver, CO); PC 1168 (Englewood, CO); PC 567 (Salt Lake City, UT); PC 1169 (Pleasant Grove, UT); and PC 736 (Auburn, WA).

121.    Therefore, the following locations that Axis is actively expanding into are part of Defendant's restricted "Territory" under Paragraph 5 of the Agreement: Phoenix, AZ; Los Angeles, CA; Denver, CO; Salt Lake City, UT; and Seattle, WA.

122.    Through its currently active expansion efforts into the above areas, Axis is currently directly engaged in a competitive business within the "Territory."

123.    Given his experience with business development on a national scale for Sunbelt, including business development for Sunbelt's Climate Control PCs, if Defendant is permitted to work for Axis as its CFO, or as a manager of one of only a small group of locations in a growing startup company, he will necessarily and inevitably engage in competitive activities within the "Territory" in connection with Axis's current and ongoing expansion efforts in the Climate Control industry.

### Defendant's Employment with Axis will Involve the Threatened and/or Inevitable Disclosure of Confidential Information and Trade Secrets

124.    Upon information and belief, Axis hired Defendant specifically because of the unique knowledge that Defendant has gained as a result of his employment with Sunbelt.  This knowledge includes, but is not limited to, Sunbelt's confidential strategies with respect to acquiring and integrating new Climate Control business, evaluating the financial performance of existing and new Climate Control PCs along with Sunbelt's unique strategies to grow their profitability, as well as his heavy involvement with confidential sales strategies, operations strategies, and marketing strategies for Sunbelt's new and existing Climate Control PCs.

125.    Axis's owner, David Walling, was aware of Defendant's intimate knowledge of Sunbelt's business strategies and trade secrets pertaining to Sunbelt's Climate Control business, including Sunbelt's strategies for growth and product development of its Climate Control PCs, among other things.

126.    Upon information and belief, Axis already employs a controller or another similar position to handle day-to-day financial and accounting responsibilities.  Therefore, Defendant's role as CFO, or other high-level role such as a Branch Manager, for a startup company with only three current branches, will necessarily include high-level strategic and business development functions, which would be similar to his prior role with Sunbelt.

127.    If Defendant is permitted to work for Axis in such a capacity, he will necessarily and inevitably use Sunbelt's confidential information and trade secrets on behalf of Axis's current growth and expansion efforts.

**Sunbelt Reminds Defendant of the Restrictive Covenants Found Within His Agreement with Sunbelt and His Obligations Under Florida Law**

128.    On August 14, 2020, shortly after Sunbelt learned of Defendant's intention to compete with Sunbelt in violation of the Agreement, Sunbelt's counsel demanded that Defendant immediately provide a written commitment to abide by the terms of the Agreement.  A true and accurate copy of this letter attached hereto as Exhibit "L."

129.    Among other things, Sunbelt's counsel reminded Defendant that the Agreement prohibited him from directly competing with Sunbelt within the "Restricted Territory" for a period of twelve (12) months following his resignation. Specifically, Sunbelt advised Defendant that competing with Sunbelt during his employment with Axis within the restricted "Territory" or owning an interest in or becoming employed by a company engaged in a similar business in the restricted "Territory" was a breach of the Agreement. Id.

130.    The letter further indicated that as Sunbelt's Director of Business Development, Defendant was intimately involved and indeed oversaw, critical aspects of Sunbelt's business development and strategic growth, including an emphasis on the growth of Sunbelt's specialty businesses, which include PCs that provide climate control services across the country. As such, the Agreement forbids Defendant from owning an interest in Axis, performing any competitive services on behalf of Axis, including assisting Axis in developing its climate control business or assisting other Axis employees to market or sell competitive climate control services, within fifty miles of Sunbelt's specialty PCs, including but not limited to its Climate Control PCs.

131.    Because Sunbelt operates Climate Control PCs within 50 miles of Axis's present locations, Sunbelt indicated that it had reason to believe Defendant's employment by Axis as its

22

CFO with an ownership interest—a position that, upon information and belief, is national in scope and encompasses all Axis locations—constituted a violation of the Agreement.

132.   In addition to highlighting that his position with and ownership interest in Axis violates the terms of the Agreement, Sunbelt reminded Defendant that his position with Sunbelt gave him access to "a large volume of Confidential Information, Intellectual Property, and Proprietary materials, including but not limited to market analysis, strategic plans, and marketing plans." In light of this, counsel advised Defendant that his knowledge of Sunbelt's Confidential Information was "entwined" with his employment with Axis, and that Defendant would inevitably utilize this information to further Axis's efforts to directly compete with Sunbelt's climate control business in the restricted Territory.

133.   On August 18, 2020, counsel for Defendant and Axis sent Sunbelt a response letter. A true and correct copy of counsel's August 18, 2020 letter is attached hereto as Exhibit "M."

134.   In her August 18, 2020 response letter, counsel confirmed that Axis had hired Defendant.  Counsel did not refute the contention that Defendant was familiar with Sunbelt's confidential information by virtue of his position, or that this confidential information and trade secrets would inevitably be used by Defendant in his role with Axis. Id.

135.   Counsel's letter contained an unsworn representation from Defendant that he purportedly did not "take" any of Sunbelt's confidential or proprietary information, that he would not use or disclose any of Sunbelt's confidential information, and that he would continue to abide by the terms of his agreement.  However, Defendant did not deny his ownership interest in Axis.

136.   Moreover, Defendant did not deny that the nature of his role at Sunbelt exposed Defendant to Sunbelt's methods of market analysis, product, analysis, and strategic planning used to grow its specialty business, and that his role in developing and executing these strategies

dispensed with any need to physically remove any documents containing confidential information from Sunbelt's possession.

137.    Furthermore, while Axis represented it did not plan to acquire any existing businesses during the twelve-month restricted period, it ignored the fact that Defendant's role at Sunbelt was not limited to acquisitions. Indeed, as detailed above, Defendant regularly developed "greenfields" strategy, was involving in high-level product and sales meetings and discussions, and analyzed the profitability of new and existing PCs across the country, including multiple Climate Control PCs within a 50-mile radius of Axis's existing or contemplated locations as set forth above.

138.    Defendant did not deny that Defendant would be involved with Axis's strategic growth and development in this respect.

139.    Indeed, such a denial would be fundamentally at odds with the normal activities of a senior executive holding an equity stake in a startup company in an active growth phase.

140.    On August 21, 2020, Sunbelt's counsel sent a second letter to Defendant, indicating that Sunbelt was not satisfied with the representations made by Axis in its initial response letter. See Exhibit "N."

141.    In this follow-up letter, Sunbelt's counsel reiterated that Defendant had a deep knowledge of Sunbelt's confidential information and trade secrets by virtue of his high-level national business development role.  Accordingly, there was no need for Defendant to take any documents or materials with him in order to provide Axis with extremely valuable confidential information and trade secrets belonging to Sunbelt.

142.    Sunbelt's counsel indicated that Sunbelt was prepared to prove that Defendant performed high-level business development services in connection with Sunbelt's specialty PCs (including, but not limited to PCs in Arizona, Nevada and California).

4842-8544-7628.v1

143.    In an effort to resolve the matter, Sunbelt's counsel once again requested that Defendant agree not to begin employment with Axis until twelve (12) months from the date of his resignation from Sunbelt.  Otherwise, counsel indicated that Sunbelt would prepare to assert its rights under the Agreement in state or federal court in Florida.

144.    After the above exchange of correspondence, Defendant's counsel recently represented that Defendant would no longer be taking the position of CFO with an equity stake in Axis.  Instead, counsel indicated that Defendant would be taking a managerial position, as the Branch Manager for Axis's Tucson, Arizona branch, while remaining a resident of South Carolina.  No proof was provided to support this representation.

145.    Defendant's counsel also represented that Defendant would be commuting to Axis's Tucson, Arizona branch from his home in South Carolina.

146.    Like all of Axis's locations, Axis's Tucson branch provides climate control equipment, a business that is competitive to Sunbelt.  See Exhibit "J."

147.    Furthermore, Defendant's counsel recently stated, via e-mail, that she was unable to represent that Mr. Monahan had performed no services for Axis.

148.    Upon information and belief, because Axis's sole business is Climate Control, Defendant has already violated his Agreement by becoming employed or engaged by Axis, or acting as an agent for, Axis in Climate Control-related activities which actually or potentially compete with Sunbelt's business.  See Exhibit "A" at page 5, ¶ 5.2.5.

149.    To date, neither Defendant nor Axis have provided any assurances that Defendant would not become employed by Axis during the 12-month restricted period.

## COUNT I
## BREACH OF CONTRACT – VIOLATION OF
## NON-COMPETE AND NON-DISCLOSURE COVENANTS

150.    Sunbelt repeats and re-alleges Paragraphs 1-149 of this Complaint and incorporates them herein in their entirety.

151.    As a condition of his hiring as an employee of Sunbelt, and in exchange for valuable consideration to which he was not otherwise entitled, Defendant entered into the Agreement with Sunbelt, which restricted Defendant, for a period of twelve (12) months after his resignation, from competing with Sunbelt or owning an interest in a competing business.  See Exhibit "A" at ¶¶ 5.2.4 and 5.2.5 (Page 5).

152.    The Agreement constitutes a valid and binding contract between Plaintiff and Defendant. All conditions precedent to Plaintiff's claim against Defendant under the Agreement have been performed, have occurred, or have been excused.

153.    The Agreement also required Defendant to maintain and not use or disclose Sunbelt's Confidential Information, Intellectual Property, and Proprietary Materials.  Id. at ¶ 5.1 (Page 4).

154.    As detailed above, through its existing and contemplated new locations, Axis is currently directly engaged in a competitive Climate Control business in the "Territory," as that term is defined in the Agreement.

155.    Defendant's employment by Axis in an executive role with an ownership interest would necessarily involve him competing with Sunbelt within the applicable "Territory."

156.    In the alternative, Defendant's employment by Axis as a Branch Manager for a climate control location would involve him competing with Sunbelt on behalf of an entity engaged in business in the "Territory."

157.    In either role, Defendant will materially breach Paragraph 5.2.5 of the Agreement by becoming employed by Axis.

158.    Finally, Defendant's employment with Axis in an executive or managerial role will necessarily and inevitably involve Defendant's use and disclosure of Sunbelt's Confidential Information, Intellectual Property or Proprietary Materials to assist Axis to grow its business, in violation of Paragraph 5.1 of the Agreement.

159.    The restrictive covenants contained in the Agreement are reasonably necessary to protect Sunbelt's legitimate business interests, which include, without limitation, Sunbelt's Confidential Information, Intellectual Property and Proprietary Materials, as those terms are defined in the Agreement.

160.    If Defendant is allowed to continue to violate his Agreement, Sunbelt will suffer immediate and irreparable harm. Under Paragraph 5.3.1 of the Agreement, Defendant stipulated that "a breach by Employee of the Restrictive Covenants would cause irreparable damage to Corporation…."

161.    Sunbelt does not have an adequate remedy at law for Defendant's breach of his Agreement.

162.    The Agreement permits Sunbelt to seek injunctive relief in order to prevent continuing irreparable harm.

163.    In order to enforce this Agreement, Sunbelt has been required to retain the undersigned counsel to represent it and has agreed to pay said counsel a reasonable fee for their services.

164.    Sunbelt has performed all of its obligations under the Agreement.

165.    Defendant's actions have been willful and malicious, and/or were undertaken with reckless indifference to the rights of Sunbelt under the Agreement.

166.     Sunbelt is entitled to preliminary and permanent injunctive relief from this Honorable Court to halt further breaches of the Agreement, like those already enumerated in this Complaint.

167.     Sunbelt demands relief as set forth in the Prayer for Relief below.

**COUNT II**
**VIOLATION OF THE FLORIDA UNIFORM TRADE SECRETS ACT –**
**THREATENED AND/OR INEVITABLE DISCLOSURE**

168.     Sunbelt repeats and re-alleges Paragraphs 1-149 of this Complaint and incorporates them herein in their entirety.

169.     As a result of his prior association and position of trust with Sunbelt, Defendant had frequent access to Sunbelt's confidential and proprietary information, including, but not limited to, Sunbelt's customer records, business plans, forecasts, customer lists, financial information, product specifications, prospect lists, and other unique information related to its efforts to build a profitable temporary climate control rental services business.

170.     As a high-ranking employee of Sunbelt focused on nationwide strategy and growth, Defendant's access to this information was so intertwined with the functions of his job with Sunbelt that he is intimately familiar with it, even if he did not take any physical documents or files with him upon his departure from Sunbelt.

171.     This confidential and proprietary information constitutes trade secrets within the meaning of the Florida Uniform Trade Secrets Act, FLA. STAT. § 688.002(4) in that it:

        a.     Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

28

      b.   Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

172.   Sunbelt exerts substantial, reasonable efforts to keep its confidential, proprietary, and trade secret information a secret, which include, but are not limited to, the maintenance of confidentiality covenants like that in Defendant's Agreement.

173.   Sunbelt derives economic value from such secrecy by depriving competitors of opportunities to use its trade secrets to gain a competitive advantage in the market.

174.   If he is permitted to work for Axis, Defendant will inevitably misappropriate Sunbelt's trade secrets in order to grow Axis's business and to unfairly compete against Sunbelt in the temporary climate control industry.  Indeed, it will put Axis in the position of a company, like Sunbelt, that has spent the time and money to develop these confidential business strategies and relationships, which will both unfairly benefit Axis and unfairly harm Sunbelt.

175.   Defendant's scope of access to Sunbelt's trade secrets, combined with Axis's intention to hire him into either an executive level role with an equity stake, or a managerial role for one of its three currently active climate control branch locations, justifies an injunction prohibiting Defendant from assuming any job responsibilities on behalf of Axis until the expiration of the Restricted Period specified in his Agreement.

176.   Defendant's knowledge of Sunbelt's confidential, proprietary, and trade secret information, combined with Axis's intention to hire him into either an executive level role with an equity stake, or a managerial role for one of its three currently active climate control branch locations, establishes that Defendant has or will misappropriate Sunbelt's confidential, proprietary, and trade secret information to assist Axis to Sunbelt's detriment and to compete against Sunbelt.

177.    Defendant's threatened and/or inevitable misappropriation of Sunbelt's trade secrets entitles Sunbelt to immediate injunctive relief, pursuant to FLA. STAT. § 688.003, as it will continue unless enjoined.

178.    Defendant has been unjustly enriched by the misappropriation of Sunbelt's trade secrets.

179.    Defendant's threatened and/or inevitable misappropriation of Sunbelt's trade secrets was/is willful and malicious, entitling Plaintiff to recover attorneys' fees. FLA. STAT. §§ 668.004(2); 668.005.

180.    Sunbelt demands relief as set forth in the Prayer for Relief below.

**COUNT III**
**VIOLATION OF THE FEDERAL DEFEND TRADE SECRETS ACT OF 2016 -**
**THREATENED AND/OR INEVITABLE DISCLOSURE**

181.    Sunbelt repeats and re-alleges Paragraphs 1-149 of this Complaint and incorporates them herein in their entirety.

182.    Similar to the FUTSA, the Defend Trade Secrets Act ("DTSA") prohibits the misappropriation of trade secrets.

183.    Sunbelt's trade secrets described herein (including, but not limited to, Sunbelt's customer records, business plans, forecasts, customer lists, financial information, product specifications, prospect lists, and other unique information related to its efforts to build a profitable temporary climate control rental services business are trade secrets pursuant to 18 U.S.C. § 1839(3).

184.    Sunbelt's trade secrets described herein are related to products or services used in, or intended for use in, interstate or foreign commerce.

30

185.    Sunbelt exerts substantial, reasonable efforts to keep its confidential, proprietary, and trade secret information a secret, which includes, but is not limited to, the maintenance of confidentiality and non-disclosure covenants such as those found in Defendant's Agreement.

186.    Sunbelt's trade secret information described herein derives independent value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the Trade Secret Information.

187.    Defendant had frequent access to, and intimate knowledge of, Sunbelt's trade secrets as a result of his prior employment with Sunbelt as its Director of Business Development for specialty, including climate control.

188.    Defendant acquired Sunbelt's trade secrets under circumstances giving rise to a duty to maintain the secrecy of those trade secrets.  Additionally, upon employment with Sunbelt, Defendant voluntarily entered into the Agreement, which included protections for Sunbelt's Confidential Information, Intellectual Property, and Proprietary Materials (as each of those terms are defined in the Agreement).

189.    Thus, at all material times, Defendant understood that he had access to, and was responsible for safeguarding and not misappropriating, Sunbelt's confidential and proprietary information.

190.    The trade secret information that Defendant had access to and knowledge of is utilized by Sunbelt in interstate commerce.

191.    If he is permitted to work for Axis, Defendant will inevitably misappropriate Sunbelt's trade secrets in order to grow Axis's business and compete against Sunbelt in the temporary climate control industry.

192.    Defendant's scope of access to Sunbelt's trade secrets, combined with Axis's intention to hire him into either an executive level role with an equity stake, or a managerial role for one of its three currently active climate control branch locations, justifies an injunction prohibiting Defendant from assuming any job responsibilities on behalf of Axis until the expiration of the Restricted Period specified in his Agreement.

193.    The risk of misappropriation is heightened here because Axis's owner is well aware of Defendant's intimate knowledge of Sunbelt's trade secrets, and because Axis is actively seeking to further expand its geographic footprint in the climate control industry into areas where Sunbelt provides substantially similar or identical services.

194.    As set forth at length herein, Defendant was directly involved in Sunbelt's growth, expansion, and high-level business strategy within the same geographic areas into which Axis is now currently expanding.

195.    Defendant's threatened and/or inevitable misappropriation of Sunbelt's trade secrets entitles Sunbelt to immediate injunctive relief, pursuant to pursuant to 18 U.S.C. §1836(b)(3).

196.    Defendant's conduct as alleged herein was/is willful and malicious, entitling Plaintiff to attorneys' fees under 18 U.S.C. § 1836(b)(3)(C)-(D).

197.    Sunbelt demands relief as set forth in the Prayer for Relief below.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Sunbelt respectfully requests judgment in its favor and against Defendant, and prays for the following relief from this Honorable Court:

A.    Entry of preliminary, and eventually permanent, injunctive relief against Defendant:

1. To immediately enjoin Defendant from assuming any job responsibilities on behalf of Axis or its affiliates, or from holding any equity or ownership interest in Axis, for twelve (12) months from the date that Defendant provides written assurances that Defendant is no longer employed by, engaged by, or acting as an agent for Axis, or for twelve (12) months from the date of the Court's order, whichever comes later; and

2. To immediately enjoin Defendant from using and/or disclosing, in any manner, any of Sunbelt's trade secrets and other confidential information, which Defendant came to know, learn, possess, or garner during his employ with Sunbelt, material of which is not publicly available and not readily ascertainable by Sunbelt's competitors, including but not limited to the following documents and information related to Sunbelt's climate control rentals business: climate control Profit Center ("PC") financial data, new product research, market studies, product analysis and sales strategies, documents pertaining to Sunbelt's climate control acquisitions and greenfields, and Sunbelt's methods, strategies and know-how regarding the growth and expansion of its climate control business.

B.      An accounting for and payment of any compensation, commission, bonus, salary, gratuity, emolument, or other gain received, directly or indirectly, by Defendant in any transaction or employment connected with the breach of the Agreement or violation of federal or Florida law.

C.      Award Sunbelt its costs associated with this action, including, without limitation, its attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(C)-(D), FLA. STAT. § 542.335(k), and FLA. STAT. § 688.005; and

D.      Grant such other and further legal and equitable relief as this Honorable Court deems appropriate.

Respectfully submitted,

*/s/ Sacha Dyson*
Sacha Dyson (509191), Trial Attorney
Gray Robinson, P.A.
401 East Jackson Street
Suite 2700
Tampa, Florida 33602
813.273.5000
813.273.5145 fax
Sacha.Dyson@gray-robinson.com
Designed Trial Counsel for Plaintiff

*/s/ Michael S. Pepperman*
Michael S. Pepperman (*pro hac vice application forthcoming*)
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102-2101
215.665.3032
917.994.2545 fax
Michael.Pepperman@obermayer.com
Attorney for Plaintiff

*/s/ Ivo J. Becica*
Ivo J. Becica (*pro hac vice application forthcoming*)
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102-2101
215.667.6335
215.665.3165 fax
Ivo.becica@obermayer.com
Attorney for Plaintiff

*/s/ Charles Shute*
Charles Shute (*pro hac vice application forthcoming*)
OBERMAYER REBMANN MAXWELL & HIPPEL LLP

4842-8544-7628.v1

Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102-2101
215.667.6335
215.665.3165 fax
Ivo.becica@obermayer.com
Attorney for Plaintiff

Date:  September 28, 2020

4842-8544-7628.v1